[L. A. No. 18665. In Bank. Apr. 21, 1944.]

HARLEY HISE, as Building and Loan Commissioner, etc., Respondent, v. CHARLES J. McCOLGAN, as Franchise Tax Commissioner, etc., Appellant.

148

Robert W. Kenny, Attorney General, H. H. Linney, Assistant Attorney General, and James E. Sabine, Deputy Attorney General, for Appellant.

George S. Dennison, W. G. Harmon and Frank P. Barton for Respondent.

CARTER, J.—Plaintiff was successful in the trial court in this action to recover franchise taxes paid under protest, and defendant prosecutes this appeal.

In 1932, Marine Building and Loan Association, hereinafter referred to as Marine, was a corporation operating in this state under the Building and Loan Association Act.

(Stats. 1931, p. 483; Deering's Gen. Laws, 1937, Act 986.) The following year the business, property and assets of Marine were taken over by plaintiff commissioner pursuant to the provisions of said act. Said business, property and assets remained in the possession of plaintiff in liquidation from June 2, 1933, until the liquidation was completed in 1940. (Stats. 1931, p. 483, §§ 13.11-13.16.) Marine has been insolvent since it was taken over. Pursuant to defendant's demand, plaintiff, in 1941, paid under protest a franchise tax and interest thereon for the income year ending on December 31, 1937, said tax being for an alleged liability for the year ending December 31, 1938. Plaintiff has also paid the $25 annual tax for Marine which is imposed where a corporation is not otherwise taxed by the Bank and Corporation Franchise Tax Act (§ 4(5). (Stats. 1929, p. 19; Deering's Gen. Laws, 1937, Act 8488.)

Section 4(1) of the Bank and Corporation Franchise Tax Act provides as follows:

"Every financial corporation *doing business* within the limits of this State, taxable under the provisions of section 16 of Article XIII of the Constitution, of this State, shall annually pay to the State *for the privilege of exercising its corporate franchises* within this State, a tax according to or measured by its net income, to be computed, in the manner hereinafter provided. . . ." (Italics added.) Section 4(5) of said act imposes an annual tax on all corporations not otherwise taxed under section 4 and not expressly exempted from the act.

Plaintiff does not question his obligation to pay the $25 annual tax as liquidator on behalf of Marine nor is it claimed that Marine would not be subject to the tax imposed by the above quoted portion of section 4(1), but he asserts that Marine is not doing business or exercising its corporate franchise because it is in the process of liquidation, and hence does not fall within the terms of section 4(1).

Turning first to the question as to whether or not Marine was doing business, we believe that that requirement is satisfied. That conclusion follows from the facts and law here involved. The Bank and Corporation Franchise Tax Act defines doing business as: ". . . actively engaging in any transaction for the purpose of financial or pecuniary gain or profit." (Sec. 5.) Under the Building and Loan Associa-

tion Act the commissioner as liquidator is given broad powers with respect to the business of the corporation being liquidated. He takes over all the business, property and assets of the corporation. (Stats. 1931, p. 483, § 13.11.) He may place a custodian in charge of its business; collect all moneys due the corporation and "do such other acts as are necessary to or expedient to collect, conserve or protect its business, property and assets." He may liquidate the affairs of the corporation and in so doing may pay claims against it; disaffirm executory contracts; require the officers of the corporation to furnish a schedule of assets and other information (*Id.*, § 13.13); release or reconvey property pledged or hypothecated to the corporation; prosecute actions; borrow money; reduce the amount of interest on loans and rewrite the same; sell and transfer property in his own name or that of the corporation; and any instrument executed to effectuate a transaction in connection with the liquidation shall be valid for all purposes the same as if it had been executed by the duly authorized officers of the corporation (*Id.*, § 13.16).

In the instant case the stipulated facts show that no surplus remained after the completion of the liquidation; and that the assets were insufficient to pay fully all of the claims; that "After the takeover, Marine did no business in its own name and did no business through its directors or officers, or through any agents appointed by them, or by the stockholders. The plaintiff, in the exercise of his statutory powers over the assets of Marine, made sales, *rentals* and transfers of the assets of Marine and made collections upon notes and other obligations which were among the assets of Marine. These activities by the Commissioner (plaintiff) commenced upon the takeover and continued thereafter through the years 1937 and 1938, until the year 1940." (Italics added.) The doing of the foregoing things by plaintiff commissioner for and on behalf of the corporation and its creditors are clearly acts of doing business within the meaning of the definition given in the Bank and Corporation Franchise Tax Act (*supra*). And the fact that they were done in the course of liquidation which finally resulted in a complete disposal of all of the assets of Marine and distribution of the proceeds thereof does not change their character. ▪ While no profit may have been made as that term is usually understood, such factor is not controlling in the definition of the

term "doing business"; rather the criterion is whether or not the goal or aim is financial or pecuniary gain. (See *Consolidated Coal Co.* v. *State,* 236 Ala. 489 [183 So. 650].) It should be clear that the commissioner in liquidating Marine was endeavoring to get the best price obtainable for its assets and to conduct its affairs in liquidation to the end that the most financial gain would be realized for its creditors and stockholders. The aim was pecuniary gain. It is true that no new deposits were accepted by plaintiff commissioner for Marine and that that is ordinarily the chief activity of a building and loan association, as a going concern, yet the transactions were of the nature typified as doing business.

It is not necessary to constitute doing business for franchise tax purposes that there be a regular course of business or transactions. This court stated in *Golden State T. & R. Corp.* v. *Johnson,* 21 Cal.2d 493, 495 [133 P.2d 395]:

"Defendant contends that East Bay Theatres, Inc., was not 'actively' engaged in any transaction for pecuniary gain or profit since its purpose was not to operate a business but merely to acquire property and derive income therefrom, and since none of the transactions occurred regularly. Such an interpretation of 'actively' would nullify the 1933 modification of the definition of doing business by reading into it the meaning given the term under the 1931 amendment defining it as 'any transaction or transactions in the course of its business' by a domestic or foreign corporation. The doing of business, however, does not necessarily mean a regular course of business under the 1933 amendment, for by its plain terms a corporation is doing business if it actively engages in any transaction for pecuniary gain or profit. Defendant would identify 'doing business' with 'carrying on a trade or business.' A series of transactions regularly engaged in may be necessary to establish the 'carrying on of a trade or business' but the Legislature made it clear that it had no such concept in mind when it referred to transaction in the singular as 'any transaction.' The word 'actively' must therefore be interpreted as the opposite of passively or inactively, and as used in section 5 it means active participation in any transaction for pecuniary gain or profit." (See, also, *Carson Estate Co.* v. *McColgan,* 21 Cal.2d 516 [133 P.2d 636].)

In *Magruder* v. *Washington, Baltimore & Annapolis R.*

*Corp.*, 316 U.S. 69 [62 S.Ct. 922, 86 L.Ed. 1278], although the court was dealing with a corporation which had been organized by the bondholders for the particular purpose of liquidating the assets of a defunct railroad company, which it was engaged in doing, as distinguished from an existing corporation being liquidated, it is pertinent in that it implicitly holds that the mere fact that the business consisted of carrying out the process of liquidation, it nevertheless possessed the character of a corporation doing business. There is no magic in the fact of insolvency or that control is being exercised by a liquidator insofar as either may have an effect on the amount and character of business being done. A net income as envisioned by the frachise tax law may result from transactions carried on by the liquidator even though the chief aim is to dispose of the assets and distribute the proceeds. Although the liabilities of a corporation may exceed its assets, its current transactions may result in a net income. If that were not true a going concern controlling its own affairs might escape the tax merely because factually it was insolvent and was disposing of its capital assets to pay its debts. Those questions go to the issue of whether there is in fact a taxable income rather than whether the franchise tax law is applicable.

There is nothing in the Bank and Corporation Franchise Tax Act that necessarily precludes the assumption that it applies to a corporation being liquidated. Principles of fairness would indicate that a business being liquidated but carrying on transactions in which solvent concerns are engaged, should receive the same treatment so far as tax liability is concerned. Otherwise, solvent corporations would be at a disadvantage.

The authorities dealing with the question of whether or not a corporation is subject to a franchise tax when it is in liquidation or in the hands of a receiver are numerous, and varying results have been reached. Some have considered that when a corporation is in that condition the franchise tax is not applicable, but they deal chiefly with the proposition of whether or not the corporation is exercising its corporate franchise under such conditions, a subject that is discussed later herein. Much of the diversity of opinion in these cases arises from the interpretation of the particular statute involved, some cases holding that the tax was solely on the bare right to exercise the corporate franchise regardless of

whether or not business has been done. The tendency has been to treat the tax statute as applicable although the corporation is in receivership. It is said in 45 Am.Jur., Receivers, §§ 410, 411, 412:

"A question upon which authorities divide exists, however, as to the accruability of such taxes [franchise taxes] during receivership. . . . Cases affirming the accruability during receivership of franchise and privilege taxes involve various factual situations, in some of which it appears that the receiver carried on the corporate business, and in others it does not so appear or the fact is regarded as immaterial. It is generally held that a franchise or privilege tax accrues during a receivership and that the receiver must pay such tax, at least where the receiver continues the operation of the business of the corporation and where the franchise tax is regarded as one upon doing business; when a receiver is thus carrying on the business of a corporation as a going concern he is in effect exercising the corporate franchise. . . .

"Although there is contrary authority, it has been both held and intimated that a franchise tax accrues during a receivership which does not continue to operate the business of the corporation. . . .

"A Federal receiver is required to pay state-imposed franchise taxes accruing during the proceedings. Under Federal statute the liability of a receiver appointed by a Federal court for state and local taxes, where the receiver conducts any business under the authority of the court, is now specifically fixed. The purpose of the Federal statute is to subject businesses conducted under receivership in Federal courts to state and local taxation the same as if such private businesses were being conducted by private individuals or corporations. In a few cases since the enactment of this statute the courts in holding the receiver liable for franchise taxes have not relied on this statute. Although there is contrary authority, the courts have held in a few cases that a franchise tax arising during a Federal receivership was payable by the receiver even though the business of the debtor corporation was not conducted by him. The view has been expressed that it is the duty of a receiver to pay the franchise tax to protect the corporate existence. Distinguishing cases holding that a corporation in the hands of a receiver is not subject to a franchise tax where the corporation has been prohibited by law

or by injunction from exercising its franchises, a court has held that the commutation excise tax upon street railways imposed by the statute of a state was a tax exacted for the privilege of operation of street railways in public ways, operation for revenue being the basis of the tax, and that there was no apparent reason why such a tax should not be paid if the railway tracks in the highway were used for operation of the railway for the purpose of obtaining receipts, even though the operation was by a receiver of the railroad. . . .

"The cases in which it has been held that a franchise or privilege tax does not accrue during the receivership of a corporation have, generally speaking, certain characteristics, as nonoperation of the corporate business by the receiver, prohibition from doing business, or practical dissolution of the corporation. In several cases the franchise tax has been regarded as one upon 'doing business,' and it has been held that if the receiver does not carry on the ordinary business of the corporation there is no ground for the tax. The same conclusion has been reached even though the corporation still exists and may, perhaps, be allowed to resume business. In some cases the decision rests apparently on the ground that the corporation is substantially dissolved. Thus, in a proceeding to wind up the affairs of an insolvent corporation and distribute its assets, in which receivers were appointed, it was held that a franchise tax assessed, under the provisions of the state law, upon the authorized capital stock of the corporation, after the appointment of the receivers, and covering the succeeding year, was not a valid claim, although the statute provided that the tax should be a debt due from the corporation to the state, and should be a preferred debt in case of insolvency; since, when the corporation passed into the hands of receivers under proceedings for its dissolution, it thereafter had no right to exercise any of the privileges conferred upon it by the state, which had taken possession of its assets for distribution among its then existing creditors. Some of the cases have held that where a Federal receiver has not continued the business of the debtor corporation franchise taxes accruing during the proceedings are not taxable." (See, also, 18 A.L.R. 700; 26 Id. 426; 76 L.Ed. 1141; 85 L.Ed. 656, 674; Fletcher Cyclopedia Corporations (perm. ed.), § 7907.) Because of the difference in the statutes construed, and the wide variation in results, those authorities are not of much assistance and a digest of them would serve

no useful purpose. The tendency above mentioned finds support in the sound policy that a corporation in the hands of a receiver or being liquidated should not be favored by being exempt from the tax over a going solvent concern, when during the process of liquidation many transactions are engaged in which are the same as those common to the latter corporation. There is nothing in the Bank and Corporation Franchise Tax Act which clearly shows that the franchise tax should not apply or that the above policy is not approved. Plaintiff relies particularly upon *State* v. *Old Abe Co.*, 43 N. M. 367 [94 P.2d 105, 124 A.L.R. 1085]. That case takes a narrow view of the definition of doing business and is out of harmony with the broad position taken by this court in *Golden State T. & R. Corp.* v. *Johnson, supra,* and *Carson Estate Co.* v. *McColgan, supra.* The case of *People* v. *Richardson,* 37 Cal.App.2d 275 [99 P.2d 366], is of no particular assistance. It merely holds that under the Bank Act where a conservator of a bank in financial difficulties, is continuing the business looking toward rehabilitation, the franchise tax is applicable. While it speaks of a distinction between a conservator and liquidator in that the former continues operation of the business, it does not consider the various acts that may be done by either, and which would constitute doing business, even though done by a liquidator. In the case at bar we have seen that transactions were conducted which constituted doing business.

Finally, it is true that the ordinary business of Marine was to receive deposits and make loans, however a necessary part of that business was the rental and disposal of property, transactions which as we have seen constitute doing business.

It will be remembered that the tax under the Bank and Corporation Franchise Tax Act is imposed upon the corporation ''for the privilege of exercising its corporate franchises.'' ■ Plaintiff contends that pursuant to the Building and Loan Association Act he is a state officer and his taking over of Marine and proceeding with its liquidation placed the corporation in the hands of the state and forfeited its corporate franchise and the license issued to operate as a building and loan association; that hence the Bank and Corporation Franchise Tax Act cannot apply because the franchises cannot and are not being exercised and no right so to do exists.

There is no provision in the Building and Loan Association

Act which provides for a forfeiture of the franchise of a corporation taken over and in liquidation. The act does generally provide that the commissioner retain possession of the property, business and assets of the corporation "until such association shall with the consent of the commissioner resume business, or until its affairs be liquidated. Such association may, with the consent of the commissioner, resume business upon such conditions as may be approved by him." (§ 13.11.) Manifestly, that provision contemplates a resumption of the business and affairs by the duly constituted corporation officers with limited or no restrictions by the commissioner, rather than implying that the corporation's franchises are forfeited and no business can be done in its name. On the contrary it is contemplated that the commissioner may make sales, transfers and rentals of property, renew and rewrite loans, and "conserve or protect its business." (§§ 13.13-13.16a.) That is to say the commissioner steps into the shoes of the corporation and proceeds with its affairs analogous to a liquidator or receiver. As heretofore seen, broad powers are given to the commissioner in liquidation and he ousts the corporate officers from control and takes complete charge of the business of the corporation. He acts for and on behalf of the corporation, its officers and creditors. (See in analogous situations *People* v. *United States Fid. & Guar. Co.*, 45 Cal.App.2d 474 [114 P.2d 389] ; *Verder* v. *American Loan Society*, 1 Cal.2d 17 [33 P.2d 1081].) The commissioner acts in a sense as a trustee or receiver. (See *Brandon* v. *Anglo-California Trust Co.*, 177 Cal. 699 [171 P. 956] ; *Richardson* v. *Superior Court*, 138 Cal.App. 389 [32 P.2d 405] ; *Mercantile Trust Co.* v. *Miller*, 166 Cal. 563 [137 P. 913] ; *Carpenter* v. *Pacific Mut. Life Ins. Co.*, 10 Cal.2d 307 [74 P.2d 761] ; *Evans* v. *Superior Court*, 14 Cal.2d 563 [96 P.2d 107].) The commissioner does not lose his status as a state officer during liquidation but he also occupies in connection therewith a position described in *Evans* v. *Superior Court, supra,* 573:

"During such time, the commissioner has the status of a trustee of a trust in private property, or in other words, the status of a trustee of a private trust. As was said in *Richardson* v. *Superior Court,* 138 Cal.App. 389, at page 394 [32 P.2d 405], 'While it thus appears that the authority of the commissioner over the property and business affairs of the association when in his custody is subject to certain pre-

scribed judicial review and control, the principal characteristics of his position as administrator are those of a public officer charged with a statutory duty which, for reasons of public policy, has been made to include a trust in private property.' In *Mercantile Trust Co.* v. *Miller*, 166 Cal. 563, at page 569 [137 P. 913], the status of the Superintendent of Banks in liquidating a bank was described as that of a 'trustee of this express trust.' In *Brandon* v. *Anglo-California Trust Co.*, 177 Cal. 699, at page 702 [171 P. 956], it was said that the Building and Loan Commissioner, in possession of an association, was 'in effect the receiver' and in *In re Union Building & Loan Association*, 16 Cal.App.2d 301 [60 P.2d 562], his status was compared to that of a guardian. (See, also, *First State Bank* v. *Conant*, 117 Neb. 562 [221 N.W. 691].) In one case, it is said 'that the superintendent of banking, as such, and the superintendent of banking as receiver are juridically two persons.' (*Bates* v. *Niles etc. Bank*, (Iowa) [226 Iowa 1077] 285 N.W. 626, 627.) It is of course clear that a public officer does not lose his status as such public officer upon assuming his duties under a statute as a trustee of a private trust (*Mitchell* v. *Taylor*, 3 Cal.2d 217 [43 P.2d 803]), but it is equally clear that he does acquire a new status and that his powers and duties must be considered in the light of such status as the trustee of such private trust. (*Carpenter* v. *Pacific Mutual Life Ins. Co.*, 10 Cal.2d 307 [74 P.2d 761].)'' Under those circumstances it cannot be said that the corporate franchises are forfeited or suspended. They are being exercised by the commissioner for the corporation, its stockholders and creditors. True the corporate officers are ousted from control but that is quite different from a forfeiture of the corporate franchises. In the case of *Mercantile Trust Co.* v. *Miller*, 166 Cal. 563 [137 P. 913], involving the question of whether the Superintendent of Banks as liquidator of a bank in liquidation, was a proper party in an action involving the bank, the court stated at page 569:

''The act (bank act) imposes upon him duties in the liquidation of such banks which will often require him to maintain or defend actions concerning them. He must collect the moneys of the bank and do all other acts necessary to conserve and liquidate its assets. When he takes possession he supersedes the bank officials in the management and con-

trol of its property and business. Its franchise to do business as a bank is thereupon suspended. In closing up its affairs he is not required to consult its officers, or cooperate with them, but acts upon his own initiative and independent of them. Upon complete liquidation and final settlement, the residue, if any, must be transferred and delivered by him to the stockholders, not to the corporation. Thereupon the franchise of the corporation to do business as a bank is terminated and it cannot be again acquired except by compliance with the provisions of the act in the same manner as a new corporation must comply.'' That language indicates that the power of the corporate officials is superseded, rather than that the corporate franchise is not being exercised by the Superintendent of Banks. True it contains the statement that the taking over suspends the franchise but that must be read in the light of the other language with respect to the powers of the corporate officers and the last sentence that the corporate franchise is lost *when the liquidation has been completed*. While it was said in *Fifth Street Building* v. *McColgan*, 19 Cal.2d 143 [119 P.2d 729], that the amendment to the federal statute had set at rest by express authorization the question of whether or not a trustee in bankruptcy of a corporation must pay the franchise tax (28 U.S.C.A. § 124a), it is also stated that ''There is no need to amend the Bank and Corporation Franchise Tax Act to specify that a trustee in bankruptcy conducting the business of a corporation shall be subject to the tax as if he were a corporation in order to insure that an intervening bankruptcy will not interrupt the application of the tax.'' The clear intimation from what was said in the opinion in that case is that Congress by its plenary powers over bankruptcy matters removed all doubt of its consent, by that statute, that a trustee in bankruptcy may be subject to the tax, and that that difficulty being removed there was nothing in the Bank and Corporation Franchise Tax Act which indicated that such tax should not apply to a trusteeship or receivership. That case held that the act of Congress gave to the trustee the status of the corporation for the purpose of imposition of the tax. Likewise in the instant case we have seen that the Building and Loan Commissioner as liquidator has been declared to be in the shoes of the corporation.

In 1943, section 5 of the Bank and Corporation Franchise

Tax Act dealing with definitions was amended to read: "The term 'bank' and the term 'corporation' as herein used shall include any 'bank' or any 'corporation' operated by any receiver, liquidator, referee, trustee or other officers or agents appointed by any court." (Stats. 1943, ch. 352, p. 1405, Deering's Gen. Laws, Act 8488.) According to the Assembly Journal the purpose of the amendment was stated to be: "Enlarges definition of 'bank' and 'corporation' in accordance with principle announced in *Fifth Street Building* v. *McColgan*, 19 Cal.2d 143 [119 P.2d 729]. Restates existing law." ■ Under appropriate circumstances an amendment to a statute may be for the purpose of clarification rather than new matter or an alteration of the former law. (See *Union League Club* v. *Johnson*, 18 Cal.2d 275 [115 P.2d 425]; *San Joaquin Ginning Co.* v. *McColgan*, 20 Cal.2d 254 [125 P.2d 36]; *Martin* v. *California Mut. B. & L. Assn.*, 18 Cal.2d 478 [116 P.2d 71].) Inasmuch as we have determined that the act prior to the amendment was applicable to the instant case, and the stated purpose of the amendment, we believe the amendment was only for clarification purposes.

■ Plaintiff contends that there was no tax due because the operating expenses plus interest falling due on claims against Marine during the year 1937 exceeded the operating revenue for the year. Defendant asserts however, that the interest on the claims was not a deductible item from the gross revenue because Marine was insolvent, the interest had not been paid for that year and because of Marine's insolvency, would never be paid; that to allow the deduction would be to place Marine's return on an accrual rather than a cash basis which cannot be done inasmuch as Marine's insolvency eliminates the expectation that the interest will be paid in the future; and that under section 12 of the Bank and Corporation Franchise Tax Act it is within the discretion of the commissioner whether a corporation shall be entitled to use the accrual or cash basis.

The books of Marine were kept on an accrual basis. If interest on both general creditors claims and holders of investment certificates became a fixed and certain liability during 1937, a year Marine was in liquidation, the amount thereof was $10,013.77. Plaintiff commissioner alleges in his complaint that: ". . . pursuant to the requirements of the said notice, claims were filed by creditors and investors of

the said association in an original . . . sum of . . . $300,-000.00; that of the said . . . sum claims of approximately $50,000.00 were paid in full . . . prior to the end of the calendar year of 1937. That there were claims filed in an original amount of $247,300.00 which remained unsatisfied as of December 31, 1937; that of the said claims, $4,246.68 represented the general claims of creditors other than investors and $243,063.32 represented the claims of investors in the association. That in addition to the said claims as filed, there were claims shown by the books of the association to exist in favor of investors against the association in the total original sum of $3,669.51, which claims were not presented or filed with the Commissioner; that the total original amount of claims of investors as of December 31, 1937, was the sum of $246,732.83. . . .

"That during the liquidation of the property, business and assets of the said association, this plaintiff and his predecessors in office have distributed, as dividends to the investors and other creditors of the said association, the total sum of $151,646.20; . . ." We assume from those allegations that the amount of claims not including interest thereon was considerably more than the payments made. In other words there was insufficient to pay even the principal. There was nothing to pay the interest that might accrue during the year.

While plaintiff states that he computed about half of the $151,646.20 paid in 1937 as interest and the balance as principal the payments were not so earmarked. Under these circumstances it must be concluded that no interest in fact became a fixed and definite liability in 1937. That follows from the general rule that when an insolvent building and loan association is in the hands of the commissioner in the process of liquidation no interest is payable during liquidation to investment certificate holders until and unless the assets are sufficient to discharge the principal obligations to all the creditors including membership shareholders. (*In re Pacific Coast Bldg.-Loan Assn.*, 15 Cal.2d 134 [99 P.2d 251].) While some of the interest claimed to have accrued in 1937, was on claims of general creditors, the reasoning in the above cited case would indicate that the general outside creditors of an insolvent building and loan association in the process of liquidation are not entitled to interest after

liquidation until the principal has all been paid to the other creditors and a surplus is available. ▮ Assuming the general outside creditors had a priority over the holders of investment certificates yet both the investment certificate holders and general creditors are creditors of the corporation and the following rule applies: "Nor is it to be implied that the prior claimants are the only ones admitted to share in the estate. They are not. On the contrary, all that happens is that they are paid first, the other creditors getting what is left. It is for this reason that prior claimants should not be allowed interest on their claims as long as the estate is not able to pay off the general claims also with interest." (Glenn on Liquidation, § 510.) In the instant case the assets in 1937 were insufficient to pay the principal of the creditor's claims, and hence there was no surplus. Therefore the interest should not have been deducted on the accrual basis for that year. At least it is obvious that there was grave uncertainty of the interest for the year 1937 ever being paid because there was insufficient to meet the principal. Those circumstances fit in with the method of allowing deductions on the accrual basis or computing income on that basis, that is, the reasonable expectation and probability that the deductible expense will be paid from income received in the future. It is stated in *Commissioner of Internal Revenue* v. *R. J. Darnell, Inc.*, 60 F.2d 82: "As to both income and deductions it is the fixation of the rights of the parties that is controlling." It is said in Law of Federal Income Taxation, Paul & Mertens, § 1174: "The basic idea is that *all the events creating the liability have occurred;* no contingency remains. The taxpayer has then earned the income, or is subject to the liability to pay." (See, also, *Id.* §§11.73, 11.96.)

The fact that the Bank and Corporation Franchise Tax Act (§ 8(b)) allows the deduction of interest "paid or accrued" does not alter the result in the light of the foregoing discussion in regard to the basis of the accrual method and the probability that no interest will be paid.

The case of *Zimmerman Steel Co.* v. *Commissioner of Int. Rev.*, 130 F.2d 1011, involved a contemplated bankruptcy and the interest accrued prior thereto. There did not exist

in that case the circumstance of the contingency of their being a surplus before any interest could be paid.

For the foregoing reasons the judgment is reversed.

Gibson, C. J., Shenk, J., Traynor, J., and Schauer, J., concurred.

CURTIS, J.—I dissent. Reference to the plain language of the Bank and Corporation Franchise Tax Act of California (Stats. 1929, p. 19; Act 8488, 2 Deering's Gen. Laws of California (1937), p. 3851) is sufficient to show that the operations of the State Building and Loan Commissioner in *liquidating* a building and loan association are not within its purview. Thus, section 4 (1) of the Act imposes a tax upon "every financial corporation *doing business* within the . . . State . . . *for the privilege of exercising its corporate franchises*" therein; and section 5 of the Act defines "doing business" as "actively engaging in any transaction for the purpose of financial or pecuniary gain or profit." Contrariwise, liquidation proceedings under authority of the Building and Loan Association Act (Stats. 1931, p. 483; Act 986, 1 Deering's Gen. Laws of California (1937), p. 538) contemplate *not* the exercise of the corporate franchise in pursuit of financial gain or profit *for the corporation,* but rather the administration of the assets of the insolvent association *for the protection first of its creditors,* and *then its investors* pursuant to its final dissolution.

The Building and Loan Commissioner derives his power entirely from the provisions of the Building and Loan Association Act. Thus, where it appears to the commissioner that "any [building and loan] association is in an unsafe condition or is conducting its business in an unsafe or injurious manner such as to render its further proceeding hazardous to the public or to any or all of its investors," he "may forthwith demand and take possession of the property, business and assets of such association and retain such possession until such association shall with [his] consent . . . *resume business, or until its affairs be liquidated.*" (§13.11; italics added.) The italicized words clearly imply that the commissioner's possession of such association constitutes an ouster of corporate management and control, with the accompanying advantages and privileges; and that the association, as such,

thereupon ceases to function under its corporate franchise as a building and loan company. Whatever acts the commissioner takes in *liquidating* the association's affairs are in pursuance of legislative mandate and in the performance of his statutory duty (*Richardson* v. *Superior Court*, 138 Cal. App. 389, 392 [32 P.2d 405]), and not by virtue of the corporate franchise to do business as a building and loan association, a privilege which to all practical purposes and intent is suspended by the very act of the commissioner in assuming control of the association for the sole purpose of winding up its affairs. (cf. *Mercantile Trust Co.* v. *Miller*, 166 Cal. 563, 569 [137 P. 913].)

Illustrative of such situation is the present case where the plaintiff as the Building and Loan Commissioner "took possession" of the Marine Building and Loan Association, and thereafter, according to the stipulated facts, "Marine did no business in its own name and did no business through its directors or officers, or through any agents appointed by them or by the stockholders." Rather, the plaintiff under statutory authority acted wholly upon his own initiative and independent of Marine's officials, without the use or employment in any way of the corporate franchise, but in complete derogation thereof, and for the single purpose of reducing Marine's assets to cash and distributing them to the persons who were beneficial participants therein as a trust fund—that is, the association's creditors, and then its investors. (*Evans* v. *Superior Court*, 14 Cal.2d 563, 573-574 [96 P.2d 107].) Indisputably, the plaintiff did not undertake to manage an association for a brief interlude because it was confronted with immediate financial embarrassment which made advisable the assumption of temporary administrative control in the conservation of its assets and the adjustment of its affairs so that it might continue its business without complete liquidation, a distinguishable status which has been held a sufficient basis for the levy of the franchise tax (*People* v. *Richardson*, 37 Cal.App.2d 275, 279 [99 P.2d 366]), but rather he took charge of Marine as an insolvent association to wind up its affairs, and his restricted operations as required incident to such purpose would not reasonably come within the concept of "doing business" in the exercise of the corporate franchise as specified in the state Franchise Tax Act, as above quoted. Thus, in com-

menting upon analogous considerations with relation to operating as contrasted with liquidating receivers, it is said in Thompson on Corporations, third ed., vol. 8, § 6393, p. 554: "The receiver is liable for a franchise tax where he continues the business, but not where he was appointed to wind up the corporation in a proceeding instituted by the state, and the reason is that the state has intervened and prevented the corporation from further exercising its franchises." (See annotations, 18 A.L.R. 704-705; 75 L.Ed. 1146-1148.)

The case of *Magruder* v. *Washington, B. & A. Realty Corp.*, 316 U.S. 69 [62 S.Ct. 922, 86 L.Ed. 1278], cited in the main opinion as illustrating that liquidation proceedings may establish that a corporation is "doing business" within the concept of franchise tax implications, involves a wholly distinct factual situation. There the property of a railroad company consisting of "certain rights of way, easements, terminal properties and other real estate," was purchased at foreclosure sale by certain persons constituting a committee of bondholders. This committee *transferred the title* to the properties so bought to a corporation which had been organized for the purpose of owning, holding and disposing of them. From time to time the corporation sold various portions of its properties as satisfactory offers were received, it rented unsold properties under short term leases, it paid all expenses incident to its activities and it distributed "all net income, except small reserves for contingencies," *to its own stockholders*. For four years the corporation had paid the federal capital stock tax levied with respect to "carrying on or doing business." At the end of that time the corporation, still continuing its activities and having about a quarter of its original properties left, sued for a refund of the tax payments. In reversing the decision of the lower courts that the corporation as a liquidating company was exempt from the levy in question (35 F.Supp. 340; 120 F.2d 441), the Supreme Court of the United States held that the applicable federal regulation including within the concept of "doing business" the "orderly liquidation of property by negotiating sales from time to time as opportunity and judgment dictate and distributing the proceeds as liquidation is effected," precisely described the corporation's activities and sustained the imposition of the tax. Thus it is said by the Supreme Court (316 U.S. 73): "During

the period in question respondent [the corporation] did not fall into that state of quietude [an exception to "doing business"] . . . in which it was merely owning and holding specific property and distributing the resulting proceeds. (citing cases.) On the contrary, respondent was actively engaged in fulfilling the purpose of its creation, the liquidation of its holdings for the best obtainable price." The distinguishing feature of that holding is the purpose of the "liquidation"—for the benefit of the *liquidating corporation and its stockholders.* Such decision would not sustain a franchise tax, based on doing business, payable by the original corporation whose operative properties had been taken away by the foreclosure and its business possibilities terminated—a situation more factually similar to the present case. As above noted, liquidation under the Building and Loan Association Act of this state contemplates only such proceedings as are necessary and incidental to ascertain the amount of liabilities of an association and apportion the assets towards the discharge of its indebtedness; and it is not for the purpose of pecuniary profit or benefit to the association but for the protection of its creditors, looking to the ultimate dissolution of the association and the complete winding up of its affairs.

The recent decisions of this court that limited activities of *solvent corporations in the exercise of their corporate franchises* may constitute "doing business" for state franchise tax purposes (*Golden State T. & R. Corp.* v. *Johnson,* 21 Cal.2d 493 [133 P.2d 395]; *Carson Estate Co.* v. *McColgan,* 21 Cal.2d 516 [133 P.2d 636]) have no application to the present case involving the *liquidation of an insolvent corporation by an officer of the state* acting under legislative mandate. Likewise distinguishable in the premise of its decision is the case of *Fifth Street Building* v. *McColgan,* 19 Cal.2d 143 [119 P.2d 729], holding that under an express amendment to the federal Bankruptcy Act [28 U.S.C.A. § 124a] a trustee in bankruptcy conducting the business of the corporation, and thereby having for tax purposes the status of the corporation, is not immune from payment of the state franchise tax. Such conclusion resting solely upon the applicable federal law does not affect the question of whether a state officer is liable for payment of the corporate fran-

chise tax by reason of his operations incident to the liquidation of an insolvent association. The plain terms of the state Franchise Tax Act, as above quoted, purport to exempt such proceedings as a basis for computation of the levy in question.

The 1943 amendment to section 5 of the Franchise Tax Act, quoted in the main opinion and expressly extending the scope of the law in its enlarged definition of the term "corporation" to "include . . . any 'corporation' operated by any . . . liquidator," of course, cannot serve to resolve the point of dispute here as to the character of the plaintiff's management of Marine during the period of liquidation in the year 1937. However, such material change in the expanse of the act is a legislative indication that a corporation in the process of liquidation by a public officer was not theretofore within its contemplation, and that the added language was necessary to effect the desired change. (23 Cal.Jur. p. 778; *People* v. *Weitzel,* 201 Cal. 116, 118-119 [255 P. 792, 52 A.L.R. 811]; *Meyerfeld* v. *South San Joaquin Irr. Dist.,* 3 Cal.2d 409, 417 [45 P.2d 321]; *Loew's Inc.* v. *Byram,* 11 Cal.2d 746, 750 [82 P.2d 1].) The Franchise Tax Commissioner's explanation, as printed in the Assembly Journal for April 20, 1943, p. 2428, that the amendment "enlarges definition of . . . corporation in accordance with principle announced in *Fifth Street Building* v. *McColgan,* 19 Cal.2d 143 [119 P.2d 729]. Restates existing law." is by no means conclusive of the meaning of the prior statutory language. While it has been held that if a certain class of taxpayers in resisting the payment of taxes pursuant to a claimed construction of the taxing statute, the Legislature in enacting an addition to the statute may very well be deemed to intend a clarification of its previous language rather than a change in the existing law (*Union League Club* v. *Johnson,* 18 Cal.2d 275, 279 [115 P.2d 425]; *San Joaquin Ginning Co.* v. *McColgan,* 20 Cal.2d 254, 264 [125 P.2d 36]), such circumstances do not appear of record to have motivated the Legislature's adoption of the 1943 amendment here noted. It may be conceded, as appears from the Assembly Journal, that such additional enactment was prompted by the discussion of the express federal law in *Fifth Street Building* v. *McColgan* (1941), *supra,* as to the obligation of a trustee in bankruptcy to pay state and local taxes accruing in consequence of the

carrying on of business and the resultant desire to place state officers in the conduct of liquidating proceedings on a parallel basis for tax purposes; but the materiality of the enlargement thereby effected in the act's scope precludes agreement with the Franchise Tax Commissioner's asseveration that the added provision was only a restatement or clarification of existing law rather than the engrafting of a new concept into the basis of imposition of the tax as theretofore declared. In 2 Sutherland, Statutory Construction, §5110, pp. 527-528, reference is made to the test employed by the New York courts as "highly satisfactory" in determining the import of an amendment: "The force which should be given to subsequent, as affecting prior legislation, depends largely upon the circumstances under which it takes place. If it follows immediately and after controversies upon the use of doubtful phraseology therein have arisen as to the true construction of the prior law it is entitled to great weight. . . . If it takes place *after a considerable lapse of time and the intervention of other sessions of the legislature,* a radical change of phraseology would indicate an intention to supply some provisions not embraced in the former statute." (Italics added.)

Without amplifying this discussion and having regard for the genesis of the legislation, it is plain that its purpose was to impose a tax upon a *corporation* actively engaged in any transaction for the purpose of financial or pecuniary gain or profit *in the exercise of its corporate franchise* within this state. In *liquidating* the business of Marine, an admittedly *insolvent* building and loan association, the plaintiff, even conceding he was "carrying on a business" as required to effectuate his purpose, was not a corporation but an individual, and under no conceivable theory could he be held to be a corporation "doing business," prior to the express specification in the 1943 amendment above noted. He was liquidating the business of Marine under the terms and limitations of the Building and Loan Association Act, and not in the exercise of the corporate franchise of the association. With these plain and undisputed facts in the case, I think the conclusion is irresistible that the plaintiff's operations incident to winding up the affairs of the Marine Building and Loan Association did not come within the purport of the Franchise Tax Act as here applicable. Accordingly, I am of the

opinion that the judgment sustaining the plaintiff's challenge of the propriety of the tax levy under the conditions here presented should be affirmed.

Edmonds, J., concurred.

Respondent's petition for a rehearing was denied May 18, 1944. Curtis, J., and Edmonds, J., voted for a rehearing.